60 F.Supp.2d 1066 (1999)
CITIZENS FOR RESPONSIBLE GOVERNMENT STATE POLITICAL ACTION COMMITTEE, Plaintiffs,
v.
Victoria BUCKLEY, Secretary of State of the State of Colorado,[1] Defendant.
Steve Durham; Phil Panckey; and The Colorado State Republican Central Committee, Plaintiffs,
v.
Victoria Buckley, as Secretary of State of the State of Colorado, Defendant.
Colorado Republicans for Choice, Inc., an unincorporated Colorado political committee; Crown Point Communications, Inc., a Colorado corporation; Dorothy S. Wham; William Thiebaut, Jr.; Donna Mullins Good; and CEA EDPAC, a Colorado nonprofit corporation, Plaintiffs,
v.
Victoria Buckley, Secretary of State of the State of Colorado, Defendant.
Nos. Civ.A. 96-S-2844, Civ.A. 96-S-2973 and Civ.A. 97-S-221.
United States District Court, D. Colorado.
August 10, 1999.
As Amended August 20, 1999.
*1067 *1068 *1069 *1070 *1071 *1072 James P. Rouse, Denver, CO, James Bopp, Terre Haute, IN, for Plaintiffs.
Elizabeth A. Weishaupl, Robert Hill, Denver, CO, for Defendant.

MEMORANDUM OPINION AND ORDER
SPARR, District Judge.
THIS MATTER came before the court for trial. Plaintiffs challenge several sections of the Fair Campaign Practices Act ("FCPA"), Colo.Rev.Stat. §§ 1-45-101 et seq., as violating their rights under the First and Fourteenth Amendments to the U.S. Constitution by infringing on protected political speech and association and by denying them equal protection of the law.[2] *1073 The FCPA was a ballot initiative adopted by the voters of Colorado at the November 5, 1996 general election and made effective by proclamation of Governor Romer on January 15, 1997. As Secretary of State for the State of Colorado, Defendant is obligated to implement and enforce the provisions of the FCPA. Plaintiffs ask the court to declare that certain provisions of the FCPA are unconstitutional and a violation of 42 U.S.C. § 1983, to enjoin Defendant from enforcing such provisions, and to award appropriate attorney fees. The court, having reviewed the entire case file, the evidentiary record, the legal arguments, and the applicable law, is sufficiently advised in the premises and renders its ruling.

I. Standard of Review
When a statute is challenged facially, it purportedly is "invalid in toto  and therefore incapable of any valid application." Steffel v. Thompson, 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). A statute is facially unconstitutional only when it cannot validly be applied to any conduct. An "as applied" challenge, however, asserts that the statute is unconstitutional as applied to a particular plaintiff's speech activity, even though the statute may be valid as applied to other parties. An "as applied" challenge is subject to a case-by-case analysis to determine whether the statute as applied to the facts of the case abridges the First Amendment. City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).
When a statute is attacked on both facial and "as applied" grounds, the latter must be considered first, unless First Amendment issues are at stake. Digioia v. Senkowski, 837 F.Supp. 492, 495 (N.D.N.Y.1993). Here, although Plaintiffs purport to challenge the FCPA both facially and "as applied," the issues and the evidence are not limited to the statute's application to a particular plaintiff's speech activity. The evidence at trial focused on whether the FCPA is facially unconstitutional, not whether the statute is unconstitutional only as applied to particular Plaintiffs. Accordingly, the court concludes that Plaintiffs' purported "as applied" challenge to the FCPA is merged into Plaintiffs' facial challenge to the statute.
In addressing Plaintiffs' challenge to the FCPA, the court begins its review "with the venerable presumption" that legislative acts are constitutional. Villanueva v. Carere, 85 F.3d 481, 487 (10th Cir.1996); see also National R.R. Passenger Corp. v. Atchison Topeka and Santa Fe Ry. Co., 470 U.S. 451, 472, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). Plaintiffs, as the parties attacking the constitutionality of the FCPA, must show beyond a reasonable doubt that it is unconstitutional. Villanueva v. Carere, 873 F.Supp. 434, 447 (D.Colo.1994), aff'd, 85 F.3d 481. Plaintiffs face a "heavy burden" to show that the statute can never be applied constitutionally. Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). If Defendant presents a fairly possible construction of the FCPA that would result in its being constitutional, the court must accept that construction and reject any construction offered by Plaintiffs that results in unconstitutionality. Communications Workers of America v. Beck, 487 U.S. 735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).
Plaintiffs challenge a series of specific sections of the FCPA. The court will address the challenged sections in turn. First, certain fundamental principles guide the court's inquiry regarding each challenged section.

*1074 II. Level of Constitutional Scrutiny by the Court
The First Amendment to the U.S. Constitution states that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The freedom of speech provided under the First Amendment is a broad, but not absolute freedom. "[S]tates have the power to regulate their elections and access to their ballots." American Constitutional Law Foundation, Inc. v. Meyer, 120 F.3d 1092, 1097 (10th Cir.1997), aff'd 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The Supreme Court has upheld "generally-applicable and evenhanded restrictions that protect the integrity of the electoral process itself." Anderson v. Celebrezze, 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). A state's broad power to regulate elections, however, "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986).
The rigorousness of this court's constitutional inquiry depends upon the extent to which the challenged law burdens Plaintiffs' First and Fourteenth Amendment rights.
When considering the constitutionality of a state election regulation that restricts core political speech or imposes "severe burdens" on speech or association, we have generally required that the law be narrowly tailored to serve a compelling state interest. But if the law imposes "lesser burdens," we have said that the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions....
Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, ___, 119 S.Ct. 636, 649, 142 L.Ed.2d 599 (1999) (Thomas, J., concurring in the judgment).
To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments ... If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, ... and is narrowly tailored to serve that interest....
Eu v. San Francisco County Democratic Cent. Committee, 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).
When deciding whether a state election law violates First and Fourteenth Amendment associational rights, this Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.
Meyer, 120 F.3d at 1098.
In order to challenge the FCPA on First Amendment grounds, Plaintiffs must first demonstrate that the statute impinges on rights protected by the First Amendment. California Prolife Council Political Action Committee v. Scully, 989 F.Supp. 1282, 1292 (E.D.Cal.1998), aff'd, 164 F.3d 1189 (9th Cir.1999). There is no question now that "[t]he First Amendment protects political association as well as political *1075 expression." Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). It appears established that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." Buckley, 424 U.S. at 14, 96 S.Ct. 612.
"Any judicial consideration of the constitutionality of campaign finance reform legislation must begin and usually end with the comprehensive decision in Buckley." Kruse v. City of Cincinnati, 142 F.3d 907, 911 (6th Cir.), cert. denied, ___ U.S. ___, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998). While the Supreme Court found that the Federal Election Campaign Act's expenditure limits imposed "significantly more severe restrictions on protected freedoms of political expression and association" than did its limitations on financial contributions, the Court also determined that "contribution and expenditure limitations both implicate fundamental First Amendment interests." Buckley, 424 U.S. at 23, 96 S.Ct. 612.
Given the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy....
The [Federal Election Campaign] Act's contribution and expenditure limitations also impinge on protected associational freedoms. Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee, ...
The Court's decisions involving associational freedoms establish that the right of association is a `basic constitutional freedom,' that is `closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'
Buckley, 424 U.S. at 21-22, 25, 96 S.Ct. 612 (citations omitted). The Court then subjected the Federal Election Campaign Act's contribution limitations "to the closest scrutiny." Buckley, 424 U.S. at 25-29, 96 S.Ct. 612.
This court must likewise subject the FCPA to strict scrutiny. See McIntyre v. Ohio Elections Com'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("When a law burdens core political speech, we apply `exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."); Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (statutory classifications impinging upon the right to engage in political expression must be narrowly tailored to serve a compelling government interest); Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) ("[R]egulation of First Amendment rights is always subject to exacting judicial review."); First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (exacting scrutiny necessitated by a state-imposed prohibition on certain political contributions by business corporations); Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[A] significant impairment of First Amendment rights must survive exacting scrutiny.") (citation omitted); Shrink Missouri Government PAC v. Adams, 161 F.3d 519, 521 (8th Cir.1998), cert. granted, ___ U.S. ___, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999); Russell v. Burris, 146 F.3d 563, 567 (8th Cir.1998) ("Government attempts to limit campaign contributions, therefore, are subject to the closest scrutiny.") (internal quotation marks and citation omitted); Carver v. Nixon, 72 F.3d 633, 637 (8th Cir.1995) ("The Court has not ruled that anything other than strict scrutiny applies in cases involving contribution limits."), cert. denied, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996); Grant v. Meyer, 828 F.2d 1446, 1452 (10th Cir.1987) ("[R]estraints *1076 on political association and communication, imposed by restrictions on financing of campaigns for ballot measures, are suspect and subject to strict scrutiny."), aff'd, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); Buckley v. Valeo, 519 F.2d 821, 843 (D.C.Cir.1975) (strict judicial scrutiny of the challenged provisions of the Federal Election Campaign Act was appropriate), aff'd in part, rev'd in part on other grounds, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

A. Colorado's Compelling Interest
Political expression is subject to government regulation provided the State can show a substantial interest in such regulation. Even a significant interference with protected First Amendment rights may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of First Amendment freedoms. Buckley, 424 U.S. at 25, 96 S.Ct. 612.
When a law burdens core political speech, courts must apply "exacting scrutiny" when passing on the constitutionality of such law and uphold it only when it is narrowly tailored to serve an overriding state interest. McIntyre, 514 U.S. at 347, 115 S.Ct. 1511. If a state law interferes with rights to free expression, it can survive First Amendment scrutiny only if the state shows that it is necessary to serve a compelling interest. Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). "`[A] significant interference with protected rights of political association may be sustained' only when the state can demonstrate `a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.'" Carver, 72 F.3d at 636 (citations omitted). A statute that infringes on the exercise of First Amendment rights "must be substantially related to a compelling government interest and must be narrowly drawn so as to be the least restrictive means of protecting that interest." Wilson v. Stocker, 819 F.2d 943, 949 (10th Cir.1987). Strict scrutiny "requires both a compelling governmental interest and legislative means narrowly tailored to serve that interest." Colorado Republican Federal Campaign Committee v. Federal Election Com'n, 518 U.S. 604, 641, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) ("CRFCC") (Kennedy, J., concurring in the judgment and dissenting in part).
Plaintiffs assert that there is no sufficient governmental interest to justify the FCPA's limits on campaign finances.

1. Corruption and the Appearance of Corruption
Plaintiffs strenuously argue that "financial quid pro quo: dollars for political favors," is the only state interest sufficiently compelling to permit restrictions on campaign finances. Federal Election Comm'n v. National Conservative Political Action Committee, 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("NCPAC"). Plaintiffs assert that the definition of corruption set out in NCPAC is the only compelling state interest sufficient to justify the FCPA's campaign finance limitations. 470 U.S. at 497, 105 S.Ct. 1459.
Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial quid pro quo: dollars for political favors.
NCPAC, 470 U.S. at 497, 105 S.Ct. 1459. Plaintiffs assert that prevention of demonstrable instances of actual corruption in the form of exchanging contributions for specific votes is the only state interest sufficiently compelling to permit restrictions on campaign finances.
The court cannot conclude that Colorado's compelling interest in campaign finance reform is limited to the actual quid pro quo corruption described by Plaintiffs. Buckley explicitly recognized that "the appearance of corruption stemming from public awareness of the opportunities for *1077 abuse inherent in a regime of large individual financial contributions" is "[o]f almost equal concern as the danger of actual quid pro quo arrangements." 424 U.S. at 26, 96 S.Ct. 612. In Buckley, the Court "specifically affirmed the importance of preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption." Federal Election Com'n v. National Right to Work Committee, 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("NRWC"). The Supreme Court has recognized that it is just as important to prevent the appearance of corruption as the actuality. NRWC, 459 U.S. at 210, 103 S.Ct. 552. Other courts have followed suit. Kruse, 142 F.3d at 913 ("the prevention of corruption or the appearance of corruption" is a "`legitimate and compelling' governmental interest that justifies restrictions on campaign financing"); Terry, 108 F.3d at 650-51 ("preventing perceived corruption is a compelling state interest"); Day v. Holahan, 34 F.3d 1356, 1365 (8th Cir.1994), cert. denied, 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995); Arkansas Right to Life State Political Action Committee v. Butler, 983 F.Supp. 1209, 1221 (W.D.Ark. 1997) (acknowledging that the state has a compelling interest in avoiding "corruption or the appearance of corruption in the political process that could result from large contributions to candidates");
In many cases, "the Court has found a compelling governmental interest in preventing corruption even without a direct quid pro quo promise in exchange for money." Clifton v. Federal Election Com'n, 114 F.3d 1309, 1321 (1st Cir.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998). In U.S. Civil Service Com'n v. Natl. Ass'n of Letter Carriers, the Court acknowledged the government's interest in curbing the appearance of undue influence in the partisan political conduct of federal employees, in order to avoid the corrosion of public confidence in the system of representative government. 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In Austin, the Court recognized a compelling governmental interest in "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." 494 U.S. at 659, 110 S.Ct. 1391. In Bellotti, the Court recognized that "[t]he overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts." 435 U.S. at 788-89, 98 S.Ct. 1407. "Preserving the integrity of the electoral process, preventing corruption, and sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government are interests of the highest importance." Bellotti, 435 U.S. at 788-89, 98 S.Ct. 1407 (internal quotation marks and citations omitted). In Federal Election Com'n v. Massachusetts Citizens for Life, Inc., the Court recognized that "the corrosive influence of concentrated corporate wealth" can corrupt "the integrity of the marketplace of political ideas." 479 U.S. 238, 257, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). "No one can doubt the compelling government interest in preserving the integrity of the system of elections through which citizens exercise the core right of a free democracy of selecting the officials who will make and execute the laws under which we all must live." Buckley, 519 F.2d at 835.
The definition of quid pro quo corruption is not as narrow as Plaintiffs assert. "[U]nlimited campaign spending" that erodes "the public's trust" in government and "pervasive cynicism" that discourages "the public's participation in the democratic process" are included in "the problems of actual and perceived quid pro quo corruption" the Supreme Court has already considered. Kruse, 142 F.3d at 916. The appearance of corruption is a recognized important government interest that is not properly limited to Plaintiffs' definition of *1078 quid pro quo promises in exchange for money.

2. Insufficient Governmental Interests
Plaintiffs correctly point out that certain purported compelling state interests have been rejected as insufficient to support campaign finance limitations. Buckley, 424 U.S. at 48-49, 57, 96 S.Ct. 612 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment; ... [T]he mere growth in the cost of federal election campaigns in and of itself provides no basis for governmental restrictions in the quantity of campaign spending.... The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise."); Berkeley, 454 U.S. at 295, 102 S.Ct. 434 ("[C]ontributors cannot be protected from the possibility that others will make larger contributions."); Kruse, 142 F.3d at 914 ("[T]he First Amendment will not countenance equalizing the financial resources of individuals and groups who wish to participate in the electoral process; ... [T]he government's interest in capping the exorbitant costs of political campaigns" is "illegitimate."); Shrink Missouri Government PAC v. Maupin, 892 F.Supp. 1246, 1253 (E.D.Mo.) ("The idea that `leveling the playing field' between the rich and the poor is a compelling justification for interference with core political speech has never been accepted by any court."), aff'd 71 F.3d 1422 (8th Cir.1995). Nor is "general public dissatisfaction with parties and politicians and the amount of money in the political process" a compelling state purpose. Federal Election Com'n v. Colorado Republican Federal Campaign Committee, 41 F.Supp.2d 1197, 1213 (D.Colo.1999).
Colorado's professed governmental interests are stated in the FCPA:
Legislative declaration. The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates allow wealthy contributors and special interest groups to exercise a disproportionate level of influence over the political process; that large campaign contributions create the potential for corruption and the appearance of corruption; that the rising costs of campaigning for political office prevent qualified citizens from running for political office; and that the interests of the public are best served by limiting campaign contributions, encouraging voluntary campaign spending limits, full and timely disclosure of campaign contributions, and strong enforcement of campaign laws.
Colo.Rev.Stat. § 1-45-102. (Emphasis added). At least two of these professed interests have been specifically rejected as sufficient compelling governmental interests to justify campaign finance limitations.
The evidence shows that, in formulating the FCPA's provisions, the drafters and proponents of the FCPA did not limit their considerations to the legitimate governmental interests of preventing corruption and the appearance of corruption.[3] Early drafts of the FCPA did not mention prevention of corruption as a goal. (Plaintiffs' Exhibits 180, 181). The Analysis of 1996 Ballot Proposals drafted by the Legislative Council of the Colorado General Assembly ("Bluebook") and mailed to every registered voter in Colorado recited several arguments for and against voting for the FCPA, but did not mention corruption or the appearance of corruption due to large contributions. (Defendant's Exhibit C). The proponents of the FCPA believed there was "too much money in politics," that the "ever-increasing growth in contributions and spending was corrupting the process in Colorado," and that special interests had too much influence on politics in Colorado. (Testimony of Patricia L. Johnson; Testimony of Dr. Craig Holman; *1079 Testimony of Ken M. Gordon). The FCPA was in part an attempt to balance special interest groups' influence with individuals, parties, and other elements. (Testimony of Holman; Testimony of Gordon; Testimony of Robert M. Stern).[4] Contribution limits were considered a method of preventing wasteful speech (Testimony of Stern) and reducing overall candidate spending (Testimony of Holman, Testimony of Stern). These professed justifications for the FCPA are impermissible. Buckley, 424 U.S. at 48-49, 57, 96 S.Ct. 612; Berkeley, 454 U.S. at 295, 102 S.Ct. 434; Kruse, 142 F.3d at 914, 916-17; Maupin, 892 F.Supp. at 1253.
Plaintiffs argue that the consideration of any insufficient governmental interest should render the FCPA unconstitutional. The court disagrees. While the Buckley Court rejected some of the compelling governmental interests asserted to support the Federal Election Campaign Act, the Court proceeded to uphold the Act on the basis of the remaining legitimate governmental interest, the prevention of corruption and the appearance of corruption. 424 U.S. at 29, 96 S.Ct. 612. As long as a legitimate compelling governmental interest existed to support the Federal Election Campaign Act, the reliance as well on insufficient governmental interests was not fatal. The same is true of the FCPA.
While certain insufficient governmental interests were considered in drafting the FCPA, the evidence shows that the proponents of the FCPA also considered the legitimate governmental interest of preventing corruption and the appearance of corruption. The proponents wanted "to get rid of the big money that was the source of the appearance of corruption." (Testimony of Johnson). Money in the system was "corrupting the independence of candidates." (Testimony of Johnson). The quantity of money contributed raised the appearance of corruption. (Testimony of Stern). The size of a contribution related to the total contributions to a campaign was considered pertinent to the appearance of corruption. (Testimony of Stern). The goal of campaign finance reform and the FCPA was to address the appearance of corruption and voter disinterest. (Testimony of Holman). That the FCPA "combined impermissible motives with permissible ones does not compel the conclusion" that the challenged sections are unconstitutional. FEC v. CRFCC, 41 F.Supp.2d at 1208.

3. Evidence of Compelling Governmental Interest
Plaintiffs argue that the evidentiary record does not substantiate the existence of corruption or an appearance of corruption in Colorado. Plaintiffs assert that merely contending that there was an appearance or public perception of corruption due to the size of campaign contributions is not sufficient. Courts have "required some demonstrable evidence that there were genuine problems that resulted from contributions larger than the limits in place." Adams, 161 F.3d at 521-22; see also NCPAC, 470 U.S. at 499, 105 S.Ct. 1459 ("[A] tendency to demonstrate distrust ... is not sufficient."); Russell, 146 F.3d at 570 (evidence was not "sufficient to establish that there could be a reasonable perception of corruption or undue influence due to large contributions"); Scully, 989 F.Supp. at 1294 ("Whatever else is true, the appearance of corruption must be more than illusory or conjectural; instead there must be real substance to the fear of corruption....") (internal quotation marks and citation omitted). However, the Court in Buckley did not cite any actual evidence that large campaign contributions gave rise to the appearance of political corruption; rather, the Court deferred to what Congress could reasonably have concluded. 424 U.S. at 27, 28, 30, 96 S.Ct. 612 (Congress "could legitimately conclude" that *1080 avoiding the appearance of corruption is essential to maintaining confidence in government; Congress "was surely entitled to conclude" that disclosure limitations alone would not adequately combat corruption and its appearance; Congress "was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.").
The evidence did not show conclusive proof of actual undue influence or corruption in Colorado stemming from large campaign contributions. See Russell, 146 F.3d at 569. No witness testified that he or she had experienced a direct quid pro quo request in return for a contribution or seen any bribes taken or votes sold. (Testimony of Victoria Buckley; Testimony of Richard D. Lamm; Testimony of Hank Brown; Testimony of Phillip L. Panckey; Testimony of Kathryn Atkinson; Testimony of William Thiebaut, Jr.; Testimony of Steve Durham; Testimony of Steve Curtis; Testimony of Patricia Miller; Testimony of Ryan Deckert; Testimony of Stern). Buckley could not recall a single investigation or prosecution of actual quid pro quo corruption occurring during her 25 years of working in the Secretary of State's office. (Testimony of Buckley).
The evidence shows, however, that "a reasonable person could perceive, ... that [large political contributions] make for undue influence or spawn corruption." Russell, 146 F.3d at 569. Richard D. Lamm testified that large contributions affect politics; in his words, "the system is oiled with money." He explained that elected officials "are bound to be influenced by money." Undue influence may not often rise to the level of prosecutable quid pro quo corruption, but it is a daily reality. (Testimony of Lamm). Undue influence tied to campaign contributions manifests itself in heightened responsiveness to political donors, voting against bills on obscure procedural grounds, or absences from crucial votes, among other things. (Testimony of Lamm). Lamm likened large political donations to "[passing] through the tollgate of influence." The public perceives these forms of undue influence, loses confidence in the democratic process, and "the legitimacy of democracy" is weakened. (Testimony of Lamm). According to Lamm, "money buying power" is the single most corrosive factor in the public mind. See Austin, 494 U.S. at 659, 110 S.Ct. 1391; Massachusetts Citizens for Life, 479 U.S. at 257, 107 S.Ct. 616.
Hank Brown testified that more small donations "look better" to the public than fewer large contributions. He acknowledged that the public has a "negative reaction to large contributions." (Testimony of Brown). Brown testified that the public is concerned about what actions are taken by political office holders in conjunction with large donations. Brown was careful from whom he took donations because of the possible "quid pro quo" connotations. (Testimony of Brown).
William Thiebaut, Jr. was once asked to pass a $1,000.00 donation through his candidate committee to candidate Rocky Germano in order to conceal the fact that the donation to Germano came from a tobacco lobby. (Exhibits 3J, 7N1). Thiebaut hoped to influence other Democrat legislators by making donations to their candidate committees. (Testimony of Thiebaut). Allen Seidenfeld testified that, while campaign contributors may not actually influence politicians' votes, contributors obtain more access to candidates than non-contributors because "money talks." (Testimony of Seidenfeld). Richard Daily testified that he was aware of a few instances of corruption. (Preliminary Injunction Hearing December 9, 1997). Ron Tupa testified that he does not accept donations from political action committees because he believes that they exercise undue influence.
Colorado Winning Edge, a subchapter S political consulting corporation, wanted to make a donation to candidate Fran Raudenbush, a pro-choice Republican candidate for the Colorado Senate in 1996. Colorado *1081 Winning Edge obtained over $13,000 from the Colorado Senate Victory Fund and gave the money to CRC as purchased mail and telephone services. (Defendant's Exhibit 4X). The entire amount was then given to Raudenbush by CRC (Amici Exhibits 7N1 and 7N2), effectively concealing the fact that the Colorado Senate Victory Fund was giving money to a pro-choice Republican candidate at a time when serious conflicts existed within the Republican Party regarding pro-choice/anti-choice issues. Despite the fact that each participant made the required disclosures, the real source of the donation to Raudenbush was concealed.
Ken M. Gordon testified that there is more to political corruption than quid pro quo promises. Gordon testified that groups that make campaign contributions "do better" with legislation and have more access to legislators than those who do not make contributions. (Testimony of Gordon). Gordon chooses not to accept contributions from political action committees so that he can better represent his constituency and so that he is not inhibited from casting votes on gun, tobacco, and water issues that would be unpopular with those industries' lobbyists. Gordon described a continuum of influence by contributors over legislators that extends from gratitude to actual control over a vote. Gordon indicated that individual voters believe their votes do not "count" if they do not make campaign contributions. (Testimony of Gordon).
Ryan Deckert, a state legislator from Oregon, testified generally about the pressure that candidates receive from people and groups who make campaign contributions. Deckert testified that even a $1,000.00 donation would not corrupt him and that he has not witnessed any express quid pro quo corruption. However, Deckert has witnessed pressure and disproportionate influence related to campaign contributions that amounts to a "more subtle quid pro quo." (Testimony of Deckert). Deckert and other witnesses described feeling less freedom and "boxed in" when they accepted contributions from political action committees. (Testimony of Deckert).
Many witnesses indicated that the public is concerned about large contributors to political candidates and that the public supports campaign finance reform. (Testimony of Phillip L. Panckey; Testimony of Thiebaut; Testimony of Paul Talmey; Testimony of Herbert Alexander; Testimony of David B. Hill; Testimony of Tupa; Testimony of Floyd Ciruli; Defendant's Exhibit 5N1; Amici Exhibit 7U). The evidence demonstrates that the public perceives corruption in campaign funding that corrodes public trust in government. (Testimony of Talmey; Testimony of Alexander; Testimony of Ciruli). There is "a link in the public perception" between campaign contributions and corruption. (Testimony of Ciruli). There is a very strong public perception that money equals influence and that "money runs the system." (Testimony of Daily, Preliminary Injunction Hearing).
The evidence contains the results of numerous polls and surveys that demonstrated a high degree of concern by the public for the appearance of corruption in the financing of political campaigns and a growing distrust of state government. (Testimony of Atkinson; Testimony of Ciruli; Testimony of Holman). The FCPA itself is a reflection of the public's increasing and ongoing concern about the appearance of corruption in the financing of political campaigns. The FCPA passed at the November 5, 1996 general election by 65.8% for the measure and 34.2% against the measure, the largest margin of any initiative on the November 5, 1996 ballot and a significant spread for any election. (Testimony of Ciruli).
The appearance of corruption exists where large political contributions erode public confidence in the democratic political system. Austin, 494 U.S. at 659, 110 S.Ct. 1391; Massachusetts Citizens for Life, 479 U.S. at 257, 107 S.Ct. 616; Bellotti, 435 U.S. at 788-89, 98 S.Ct. 1407; Letter Carriers, 413 U.S. at 565, 93 S.Ct. 2880; *1082 Buckley, 519 F.2d at 835. The impact of large contributions causes a public perception that undermines the integrity of the democratic process. "[T]he feeling that big contributors gain special treatment produces a reaction that the average American has no significant role in the political process." Buckley, 519 F.2d at 841.
The court concludes that the evidence supports the existence of a tangible threat to Colorado citizens' confidence in the democratic process. The evidence demonstrates that the State has a compelling interest in campaign finance reform and that the FCPA addresses "the reality or perception of undue influence and corruption attributable to large contributions." Russell, 146 F.3d at 568. The FCPA is targeted at reducing the reality and appearance of corruption created by large campaign contributions and at increasing public confidence in the democratic process. The State has adequately demonstrated that Colorado's citizens reasonably perceive corruption as a result of large campaign contributions. The evidence demonstrates a compelling governmental interest served by the FCPA's limitations on campaign contributions.
Next, the court must determine whether the State has demonstrated that the FCPA's challenged contribution limits are narrowly drawn to serve Colorado's compelling interest in preventing the reality or appearance of corruption created by large campaign contributions.

B. Narrow Tailoring
"Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." Massachusetts Citizens for Life, 479 U.S. at 265, 107 S.Ct. 616. The issue here is whether the FCPA's challenged limits on contributions are narrowly tailored to serve the State's interest in preventing the appearance of corruption caused by large campaign contributions. The court will address each challenged section of the FCPA in turn.
Again certain general principles govern the court's analysis of each section of the FCPA. This court must not "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." NRWC, 459 U.S. at 210, 103 S.Ct. 552. The court has "no scalpel to probe" whether a higher ceiling might not serve as well as the limits established by the FCPA or to determine the precise amount that would effectuate the State's compelling interest. Butler, 983 F.Supp. at 1225 (quoting Buckley, 424 U.S. at 30, 96 S.Ct. 612). The court is "not free to fine tune the limits established" by the FCPA. Carver, 72 F.3d at 641. Thus, "[o]n questions of degree, of drawing the line, sound doctrine gives [the legislative branch] latitude for reasonable judgments unless the degree of regulation is so stark as to border on prohibition." Buckley, 519 F.2d at 842. The court can only determine whether the FCPA's limits are narrowly tailored to address the propounded compelling interest of the State.

1. Colo.Rev.Stat. § 1-45-104(2)
In Claim I in Civil Action No. 96-S-2973 and the Second Claim in Civil Action No. 97-S-221, Plaintiffs Durham, Thiebaut, CRC, CEA EdPAC, and Good challenge the aggregate contribution limits to candidate committees set forth in § 1-45-104(2). Plaintiff Good's challenge is limited to § 104(2)(a). The challenge by Plaintiffs Thiebaut and CRC is limited to § 104(2)(b). Section 104(2) provides:
No natural person or political committee shall make, and no candidate committee shall accept, aggregate contributions to a candidate committee for a primary or general election in excess of the following amounts:
(a) Five hundred dollars to any one governor, lieutenant governor, secretary of state, state treasurer, or attorney general candidate committee; and

*1083 (b) One hundred dollars to any one state senate, state house of representatives, state board of education, or regent of the University of Colorado candidate committee.
Plaintiffs Durham, Thiebaut, CRC, CEA EdPAC, and Good contend that § 104(2) is unconstitutional because it burdens their First Amendment rights, is not narrowly tailored to any compelling state interest, and violates their right to equal protection of the law.
Section 104(2) places limits on contributions to candidates by natural persons and political committees. While contributions may be limited to prevent the appearance of corruption due to large campaign contributions, the limits may not be so low as to unduly infringe upon non-corrupting speech and association. See Buckley, 424 U.S. at 28-29, 96 S.Ct. 612. "[W]hat determines the constitutionality of the limits is the dollar amount of the limits." Carver, 72 F.3d at 640 (internal quotation marks and citation omitted). The analysis of appropriate limits depends on the circumstances of the specific political race. Montana Right to Life Ass'n v. Eddleman, 999 F.Supp. 1380, 1386 (D.Mont.1998). Therefore, § 104(2) of the FCPA must be narrowly directed at large contributions in Colorado elections. Thus, Defendant's burden is to show that the limits set forth in § 104(2) are narrowly tailored to address the compelling state interest in preventing the reality or appearance of corruption resulting from large campaign contributions to candidates in Colorado.

a. Is § 104(2) Narrowly Tailored to the State's Compelling Interest?
Courts have taken several approaches to defining what constitutes a large contribution and thus one that may be limited under the constitutional standard set forth in Buckley, 424 U.S. at 1, 96 S.Ct. 612. In Buckley, the Supreme Court approved a $1,000 contribution limit as a narrowly tailored means to address the problem of large campaign contributions. 424 U.S. at 20-35, 96 S.Ct. 612. The Court in Buckley found that the $1,000 contribution limit would not severely impact political dialogue, noting that 94.9 percent of the contributions in the 1974 election came from contributions of $1,000 or less. 424 U.S. at 21 n. 23, 26 n. 27, 96 S.Ct. 612. While the contribution limit upheld in Buckley does not constitute a constitutional minimum, the $1,000 limit gives this court some guidance on what limit may be appropriate. Adams, 161 F.3d at 523; Butler, 983 F.Supp. at 1225.
Plaintiffs Durham, Thiebaut, CRC, CEA EdPAC, and Good assert that the contribution limits in § 104(2) are "a cure in search of a disease," that is, the contribution limits are not narrowly tailored to the State's legitimate concerns about the reality or appearance of corruption caused by large campaign contributions.
One approach to defining large contributions was used in Russell, 146 F.3d at 571, wherein the $1,000 limit upheld in Buckley was adjusted for inflation and compared to the limits challenged. In Russell, the Eighth Circuit Court of Appeals found that, after adjustment for inflation, contribution limits to candidates of $100 and $300 were dramatically lower than the $1,000 limit upheld in Buckley and were unconstitutionally low. 146 F.3d at 571; see also Adams, 161 F.3d at 523. Under this analysis, the $100 and $500 limits of § 104(2) would likewise be dramatically lower than the $1,000 limit upheld in Buckley and unconstitutionally low. Under Buckley, the $100 and $500 limits of § 104(2) would be so low as to constitute a "difference in kind." 424 U.S. at 30, 96 S.Ct. 612.
Another approach to defining large contributions was used in Carver, 72 F.3d at 643, and Day, 34 F.3d at 1366, wherein the courts evaluated the percentage of past contributions and contributors that would have been affected by the new limits. The logic of this analysis is that if a substantial number of contributors have historically given above the new limits, and/or if a substantial number of contributions have *1084 historically exceeded the new limits, then the new limits are not tailored to address those few "large" contributions which could appear corrupting in the context of the particular campaigns in question.[5] In Day, the court determined that one-fourth to one-third of past contributions would have exceeded the limits. 34 F.3d at 1366. In Carver, the court determined that between 19 percent and 35.6 percent of past contributors would have been affected by the challenged limits, depending upon the race. 72 F.3d at 643-44. In both of these cases, the limits were found unconstitutionally low when the percentage of past contributions and contributors that would have been affected was compared to the 5.1 percent of contributions that were affected by the limits in Buckley, 424 U.S. at 21 n. 23, 26 n. 27, 96 S.Ct. 612. Carver, 72 F.3d at 643-44; Day, 34 F.3d at 1366; see also Butler, 983 F.Supp. at 1226.
As in Carver, 72 F.3d at 643-44, and Day, 34 F.3d at 1366, there is substantial evidence in the record that the limits established by § 104(2) will affect a much larger percentage of past contributors and contributions than the 5.1 percent of contributors that were affected by the limits in Buckley, 424 U.S. at 21 n. 23, 26 n. 27, 96 S.Ct. 612. (Exhibits 2D, 2E, 5R, 8, 9, 10, 21, 37; Testimony of Dorothy Wham). In the 1994 gubernatorial campaign, § 104(2) would have affected $1.1 million of candidate Benson's campaign contributions. (Testimony of Atkinson). In the 1996 State Senate campaign, § 104(2) would have affected a substantial portion of Senator Ken Chlouber's campaign contributions. (Testimony of Durham; Exhibit 2). Even after the significant reductions in the percentages established by cross-examination by Defendant and Amici, § 104(2)'s limits affect a much larger percentage of past contributors and contributions than the 5.1 percent of contributors affected by the limits in Buckley, 424 U.S. at 21 n. 23, 26 n. 27, 96 S.Ct. 612. Defendant concedes that between 6.4 and 18.6 percent of all contributions in certain races would be affected by § 104(2). (Defendant's Proposed Findings and Conclusions ¶ 71.). Under this method of analysis as well, the $100 and $500 limits of § 104(2) would be so low as to constitute a "difference in kind." Buckley, 424 U.S. at 30, 96 S.Ct. 612.
Another approach to defining large contributions was used in Russell v. Burris, 978 F.Supp. 1211, 1221 (E.D.Ark.1997), aff'd in part, rev'd in part, 146 F.3d 563, wherein the court evaluated the largeness of campaign contributions relative to the total campaign expenses. Under this method, a $100 and $500 contribution pursuant to § 104(2) would be less than 2 percent of the total campaign contributions in 1994. See Exhibits A, B, Demonstrative Exhibit 161. The logic of this approach is that a contribution made at the maximum limits would constitute such a low percentage of the total funds raised by a typical campaign, based upon historical data, that it could not reasonably carry any appearance of corruption resulting from large contributions. However, this analysis was never specifically approved by the Eighth Circuit. Russell, 146 F.3d at 571.
Under any of these methods of analysis, § 104(2) restricts far more than the "large" contributions which arguably could be the source of the appearance of corruption. In other words, § 104(2) limits far more contributions than necessary and impacts the exercise of First Amendment rights to a far greater degree than necessary or justifiable to accomplish its goal of preventing the reality or appearance of corruption resulting from large campaign contributions. See Carver, 72 F.3d at 638-39 (state's compelling interest is in limiting *1085 large contributions, not all contributions); see also Massachusetts Citizens for Life, 479 U.S. at 265, 107 S.Ct. 616. The principles behind limiting large campaign contributions, as set forth in Buckley, 424 U.S. at 1, 96 S.Ct. 612, are not properly extended to all, rather than just large, contributions. Carver, 72 F.3d at 638-39.
Nor does the evidence establish that § 104(2) was intended to address the reality or appearance of corruption caused by large campaign contributions. While the concept of corruption did not appear in the early draft of the FCPA's legislative declaration, the $100 and $500 contribution limits of § 104(2) did appear in the first draft of the FCPA. (Exhibits 180, 181). The FCPA recites in its Legislative Declaration that its purpose is not only to address the potential for corruption and the appearance of corruption resulting from large political contributions, but also to prevent "wealthy contributors and special interest groups" from exercising "a disproportionate level of influence over the political process," to reduce "the rising costs of campaigning for political office," and to generally serve "the interests of the public." Colo.Rev.Stat. § 1-45-102. The contribution limits in § 104(2) appear to have been more precisely tailored to certain of these goals (which the Supreme Court has specifically recognized as insufficient to justify the imposition of contribution limits) than to the legitimate compelling goal of preventing corruption or the appearance of corruption caused by large campaign contributions.
The FCPA's contribution limits were established through a process of consensus among the proponents and supporters of the initiative. The proponents of the FCPA arrived at the contribution limits after negotiating with many interested groups. The contribution limits reflected, inter alia: the interests of groups who offered funding for the initiative, interests in ensuring certain political groups were not harmed, interests in reallocating the donor base away from certain groups, and interests in reducing the influence of certain political groups. (Exhibits 158, 159, 183, 184, 186, 187, 188, 189; Testimony of Johnson; Testimony of Gordon). The limits established by § 104(2) represent the lowest amounts that the proponents believed could be agreed on by the various interested groups and passed by the voters. Id.
The drafters and proponents of the FCPA did not analyze whether the contribution limits set forth in § 104(2) were set at a level which would represent a significant percentage of the contributions received in a typical campaign or what percentage of contributors or contributions in Colorado would be affected by the new contribution limits. (Testimony of Holman; Testimony of Stern). In establishing the $100 and $500 contribution limits set forth in § 104(2), the proponents of the FCPA considered such factors as historical average expenditures for Colorado campaigns and the limits that were being proposed or adopted in other states. The proponents attempted to establish the lowest contribution limits practicable within these constraints. The evidence shows no real analysis was done to correlate the $100 and $500 limits to the professed concern about corruption or the appearance of corruption created by large campaign contributions.
The contribution limits in § 104(2) allegedly were chosen to be less than the $500 median contribution by four major contributors in Colorado in 1994. (Testimony of Stern; Exhibit B pp. 51-52, 55-57, 58-60, 64-66). Under Carver, 72 F.3d at 643-44, and Day, 34 F.3d at 1366, limits that affect half of all contributions and contributors are not narrowly tailored. In addition, it is not clear that $500 is the correct median for those four contributors in 1994. It is also not clear what criteria were used to select these four contributors or why the $100 dollar limit was set substantially lower than the $500 median. Nor did the $500 median relate to any special issues or circumstances in the 1994 election in Colorado. (Testimony of Stern). The evidence suggests that the contribution limits established *1086 by § 104(2) are either speculative or are more tailored to constitutionally impermissible purposes, such as reducing the amount of money spent in political campaigns, than to concerns about the reality or appearance of corruption resulting from large campaign contributions.
Since approximately 1980, the typical Colorado House and Senate campaign spends in excess of $20,000 per candidate. (Exhibits A, B). Some campaigns spend considerably more. (Testimony of Durham). Pat Johnson, as the representative of the League of Women Voters of Colorado and one of the principal participants in the design and creation of the FCPA, acknowledged that a $100 contribution would not be "large" (in terms of carrying a reasonable onus of the appearance of corruption) in the context of a $10,000 campaign and would be even less "large" in the context of a campaign in which it would constitute less than 1% of the total contributions received. (Testimony of Johnson). The League of Women Voters, in a study of Colorado House and Senate campaigns, defined contributions of $250 or less as small. (Exhibit 7L p. 5).
Other witnesses agreed that $100 could not be corrupting. (Testimony of Brown; Testimony of Durham). Richard Lamm indicated that the $100 and $500 limits of § 104(2) were not "actually corrupting," but "begin to appear" to be. The public perceives contributions of $1,000 as corrupting. (Testimony of Lamm). There is virtually no evidence before the court that $100 or $500 contributions raise the appearance of corruption. See Testimony of Ciruli. Defendant and Amici have not demonstrated why the $100 and $500 were necessary to address the reality or appearance of corruption created by large campaign contributions.
Dr. Craig Holman acknowledged that the FCPA has the effect of addressing interests well beyond regulating the appearance of corruption resulting from large political contributions. He viewed the FCPA as a tool for reducing what he believes to be excessive campaign expenditures and public disillusionment with state politics. (Testimony of Holman).
Defendant and Amici have presented substantial evidence that the $100 and $500 contribution limits are reasonably related to historical spending by candidates in Colorado. (Testimony of Wham; Testimony of Panckey; Testimony of Johnson; Testimony of Holman; Testimony of Buckley; Testimony of Thiebaut; Testimony of Brown; Testimony of Tupa; Testimony of Stern; Exhibits A, B, 2D-2K, 2N, 20, 2P, 2R, 4W, 4X(1)-(4), 5R, 21). The drafters and proponents of the FCPA considered the past spending patterns of Colorado candidates contained in some of the Secretary of State's records to determine appropriate limits. (Testimony of Johnson; Testimony of Holman; Testimony of Stern; Exhibits A, B). For example, the average contribution to Colorado House and Senate candidates is below the limits imposed by the FCPA. (Exhibits A, B). Defendant and Amici ably argue that people will adapt to the FCPA's limits by finding other methods of contributing and receiving campaign money, i.e., a candidate could contribute personal funds to his or her campaign, husbands and wives could contribute as individuals rather than as a couple, and officers of a corporation could contribute individually rather than as a corporation. (Testimony of Talmey). Defendant and Amici assert that there are more candidates running vigorous campaigns with more money than in the past, all under the limits of the FCPA. Because the FCPA's limits are reasonable and accurately reflect actual campaign spending in Colorado, Defendant and Amici assert that the limits do not have a dramatic adverse effect on the funding of campaigns, and do not amount to a "difference in kind."
The court must determine whether the FCPA's limits are specifically directed at the size of contributions that are large enough to raise the State's legitimate concern about the reality or appearance of corruption caused by large campaign contributions. *1087 Defendant's and Amici's extensive evidence that the FCPA's contribution limits are closely tied to average historical campaign spending in Colorado does not address how the limits are narrowly tailored to corruption or the appearance of corruption caused by large campaign contributions in Colorado elections. The evidence that the contribution limits are closely tied to average historical campaign spending in Colorado does not provide the necessary link to concerns about the reality or appearance of corruption. The Defendant's evidence does not demonstrate narrow tailoring of § 104(2) to the accepted compelling state interest in avoiding corruption or the appearance of corruption created by large contributions.
The contribution limits set forth in § 104(2) are not tailored to address the sole legitimate justification for such limits: preventing corruption and the appearance of corruption caused by large campaign contributions. Based upon historical data, the $100 and $500 contribution limits impact far too high a percentage of campaign contributors and contributions to be considered even minimally tailored to address those contributors who may create the appearance of corruption through large contributions. The $100 and $500 contribution limits are substantially lower than necessary to adequately address the State's legitimate concerns with the reality or appearance of corruption resulting from large contributions. In accordance with numerous cases around the nation, the inescapable conclusion is that § 104(2) sets contribution limits far lower than reasonably necessary to address the reality or appearance of corruption resulting from large contributions. The evidence establishes that § 104(2) is not narrowly tailored to address the State's sole legitimate concern. Not being narrowly tailored to a compelling state interest, § 104(2) violates the Plaintiffs' First Amendment rights.[6]

2. Colo.Rev.Stat. § 1-45-104(7)
Section 1-45-104(7) provides:
No political committee shall accept an aggregate contribution from any person in excess of two hundred fifty dollars per house of representatives election cycle.
In Count VI in Civil Action No. 96-S-2844, Plaintiff CRGSPAC challenges the contribution limit to political committees set forth in § 1-45-104(7). CRGSPAC contends that § 104(7) is unconstitutional on its face because it burdens CRGSPAC's associational rights without any compelling state interest and because it violates CRGSPAC's right to equal protection of the laws. In Claim II in Civil Action No. 96-S-2973 and the Third Claim in Civil Action No. 97-S-221, Plaintiffs Durham, the Republican Party, Crown Point, CRC, and Good also challenge § 104(7), contending that § 104(7) abridges their First Amendment rights because it is not narrowly tailored to serve a compelling state interest and denies them their right to equal protection of the laws.
Section 104(7) does not limit direct contributions to candidates or independent expenditures to support candidates. Rather, it only limits aggregate contributions to political committees, which retain discretion to disburse the funds in any manner. Plaintiff's challenge, therefore, involves what has been characterized by the Supreme Court as "speech by proxy" because the actual limit is on the amounts contributed to a political committee, not to a candidate. California Med. Ass'n v. Federal Election Com'n, 453 U.S. 182, 196-97, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) ("CalMed") This type of political speech does not receive the full protection afforded direct political contributions because limitations on contributions to political committees do not significantly infringe First Amendment rights. CalMed, 453 *1088 U.S. at 196-97, 101 S.Ct. 2712; Russell, 146 F.3d at 571.
In addition, the State has a compelling interest in limiting contributions to political committees. Day, 34 F.3d at 1365. Limits on contributions to political committees have been upheld as furthering legitimate governmental interests in preventing the appearance of corruption on the grounds that without such limits, individuals could use political committees to evade the limits on individual contributions to candidates. CalMed, 453 U.S. at 197-99, 101 S.Ct. 2712; Terry, 108 F.3d at 649. However, the issue remains whether the limit established by § 104(7) is narrowly tailored to serve the State's compelling interest in preventing the appearance of corruption resulting from large campaign contributions in Colorado.
Plaintiffs strenuously argue that § 104(7) is not narrowly tailored to the State's compelling interest. According to Plaintiffs, the evidence indicates that § 104(7) addresses the impermissible goals of reallocating the donor base away from political committees and limiting independent expenditures in order to reduce the speech of political committees. There is evidence in the record demonstrating that the $250 limit on contributions to political committees was largely based on the impermissible purpose of restricting the speech of some political participants "in order to enhance the relative voice of others." Buckley, 424 U.S. at 48-49, 96 S.Ct. 612. The $250 limit was intended to "get big money out of the system." (Testimony of Johnson). An initial draft of the FCPA suggested that 60% of all campaign contributions should come from individuals and that political committees should be limited to a certain percentage of all campaign contributions. (Testimony of Johnson). Many proponents of the FCPA's limits were concerned about the amount of campaign contributions made by political committees. During the drafting of the FCPA, consideration was given to certain types of political committees over other types of political committees. (Exhibit 159). Proponents of the FCPA believed "free-spending special interests" were a problem, that political committees had a disproportionate amount of financial influence, and that political committees gave too much money to incumbents. (Testimony of Alexander; Testimony of Gordon; Testimony of Lamm; Testimony of Johnson; Exhibit 7L). There is no clear explanation in the evidence of a "special interest." Every individual or group has interests to protect or promote in the political arena. The evidence shows that the top major campaign contributors in 1992 and 1994, with which the FCPA's proponents and supporters professed to be concerned, were not all political committees. (Exhibits A and B). Provisions of the FCPA were also intended in part to limit political committees' independent expenditures. (Testimony of Johnson).
However, the evidence also shows that the $250 limit was selected to address campaign reform as a whole and to prevent contributions from flowing into political committees to avoid the FCPA's other restrictions. Limitations on contributions to political committees are an appropriate means by which to protect the integrity of the entire scheme of contribution limits. Cal-Med, 453 U.S. at 199, 101 S.Ct. 2712. Provisions designed to prevent evasion of other important provisions of an integrated statutory attack on corruption and its appearance in politics are constitutional. Austin, 494 U.S. at 664, 110 S.Ct. 1391; Cal-Med, 453 U.S. at 197-99, 101 S.Ct. 2712; Buckley, 424 U.S. at 38, 96 S.Ct. 612; Terry, 108 F.3d at 649. The court concludes that preventing individuals from channeling their contributions through political committees and thus avoiding the limit on individuals' contributions is a valid purpose. Protection of the FCPA as a whole and prevention of evasion of its other provisions constitute legitimate governmental interests in deterring actual or apparent corruption of the political process in Colorado. CalMed, 453 U.S. at 198-99, 101 S.Ct. 2712. As discussed in *1089 part A.2. above, the inclusion of impermissible motives with permissible motives does not render § 104(7) unconstitutional. FEC v. CRFCC, 41 F.Supp.2d at 1208.
In determining whether the limit established by § 104(7) is narrowly tailored to serve the State's compelling interest, the court also applies the same approaches used to analyze § 104(2), above. Under the analysis used in Russell, 146 F.3d at 571, the $250 limit is significantly lower than the $1,000 limit upheld in Buckley, 424 U.S. at 20-35, 96 S.Ct. 612. The $250 limit is also dramatically lower than the $5,000 limit upheld in CalMed, 453 U.S. at 193-200, 101 S.Ct. 2712. The $250 limit on contributions to political committees in Colorado is 1% of the federal $25,000 limit on contributions to political committees. The court recognizes that the $1,000 limit upheld in Buckley, 424 U.S. at 20-35, 96 S.Ct. 612, the $5,000 limit upheld in CalMed, 453 U.S. at 193-200, 101 S.Ct. 2712, and the $25,000 federal limit all apply to large federal election campaigns, while § 104(7) applies only to Colorado election campaigns that are smaller and less expensive than federal campaigns. However, under this test alone, the $250 limit in § 104(7) is so low as to constitute a "difference in kind." 424 U.S. at 30, 96 S.Ct. 612.
Under the analyses used in Carver, 72 F.3d at 643, Day, 34 F.3d at 1366, and Russell, 978 F.Supp. at 1221, the court finds little evidence in the record to indicate that § 104(7)'s $250 limit is unconstitutionally low. The evidence of the effect of the $250 limit on past contributors and past contributions to CRGSPAC is sketchy and, the court finds, unreliable. The evidence is likewise scant of the effect of the $250 limit on the other Plaintiffs. (See Exhibit 39). Defendant's evidence shows little or no effect of the $250 limit on Plaintiffs. (Exhibits 2D, 2E). Under these tests, the evidence does not demonstrate that the $250 limit is unconstitutionally low.
Whether or not the $250 limit is unconstitutionally low, the evidence does not show that § 104(7) is narrowly tailored to address the reality or appearance of corruption caused by large campaign contributions. The concern about political corruption from large contributions, which is "a possibility when the contribution is to an individual candidate," is not as likely to be present "when the contribution is given to a political committee or fund that by itself does not have legislative power." Day, 34 F.3d at 1365. The $250 limit on contributions to political committees is not particularly tailored to the concern about corruption of candidates by large contributions. The $250 limit on contributions to political committees extends to far more than the potentially corrupting "large" campaign contributions that the State has a compelling interest in preventing. The evidence shows that Colorado political committees generally do not receive large contributions. The placing of limits on campaign contributions by political committees was "appealing" to the public (Exhibit 7U, admitted under seal), but appears to have no basis in preventing the corruption of candidates by large contributions. The evidence is insufficient to show that the $250 limit is appropriate to prevent actual or apparent corruption due to large campaign contributions.
In sum, § 104(7) suffers from the same constitutional infirmities as does § 104(2), analyzed in part B.1. of this opinion, above. The court must conclude that the $250 limit on contributions to political committees is not narrowly tailored to the purpose of preventing the corruption or appearance of corruption of candidates by large contributions and is therefore unconstitutional as violative of Plaintiffs' First Amendment rights.[7]

*1090 3. Colo.Rev.Stat. § 1-45-104(1)
In the Fifth Claim in Civil Action No. 97-S-221, Plaintiffs Thiebaut and CEA EdPAC challenge the aggregate contribution limits from political committees to candidate committees set forth in § 1-45-104(1). Section 1-45-104(1) provides:
In the applicable election cycle, the candidate committee of each candidate for the following offices are prohibited from receiving an aggregate total of contributions from political committees in excess of:
(a) Ten thousand dollars for the house of representatives, state board of education, and regent of the University of Colorado;
(b) Fifteen thousand dollars for the state senate;
(c) Twenty thousand dollars for lieutenant governor;
(d) Eighty thousand dollars for secretary of state, attorney general, or state treasurer;
(e) Four hundred thousand dollars for governor.
Thiebaut and CEA EdPAC contend that § 104(1) is unconstitutional because it burdens their First Amendment rights, is not narrowly tailored to any compelling state interest, and violates their right to equal protection of the law. More specifically, Plaintiffs argue that: (1) § 104(1) is no more than an impermissible reallocation of the donor base resulting in an absolute ban on contributions from any political committees after the aggregate amount has been reached, and (2) § 104(1) discriminates against political committees without any rational basis, in violation of Plaintiffs' right to equal protection.

a. Narrow Tailoring to a Compelling Government Interest
Ancillary measures have been favorably recognized as appropriate means to counteract possible end runs around direct contribution limitations. Buckley, 424 U.S. at 38, 96 S.Ct. 612. "[T]he `differing structures and purposes' of different entities `may require different forms of regulation in order to protect the integrity of the electoral process.'" NRWC, 459 U.S. at 210-11, 103 S.Ct. 552 (quoting CalMed, 453 U.S. at 201, 101 S.Ct. 2712). Once the basic limits have withstood constitutional scrutiny, other provisions that are "corollaries" to those basic limits are likewise constitutional because they "protect the integrity of the contribution restrictions." CalMed, 453 U.S. at 199, 101 S.Ct. 2712. Accordingly, aggregate limits are "integral to the effectiveness of the overall statutory scheme." Terry, 108 F.3d at 649. "The governmental interest in preventing both actual corruption and the appearance of corruption of elected representatives has long been recognized, ... and there is no reason why it may not in this case be accomplished by treating unions, corporations, and similar organizations differently from individuals." NRWC, 459 U.S. at 210-11, 103 S.Ct. 552 (quoting CalMed, 453 U.S. at 201, 101 S.Ct. 2712) (citation omitted).
There is evidence in the record regarding evasion of certain contribution restrictions by political committees, i.e., conduits, pass-throughs, and recharacterizing the source of contributions. The aggregate limits set out in § 104(1) are necessary to prevent evasion of the contribution limits by those who could otherwise contribute large amounts of money to a candidate through a political committee. See Gard v. Wisconsin State Elections Bd., 156 Wis.2d 28, 456 N.W.2d 809, 823, cert. denied, 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990). The aggregate limits are also necessary because of the ability of political committees to join together or to proliferate more political committees to make large contributions that could unduly influence a candidate's campaign. Gard, 456 N.W.2d at 823. "The infinite ability to multiply committees [can eviscerate] statutory limitations on contributions...." Buckley, 519 F.2d at 837. The aggregate limits of § 104(1) are "a necessary and constitutional means of [c]losing a loophole that would otherwise destroy the effectiveness of other statutory provisions." Buckley, 519 F.2d at 853. The court concludes *1091 that a sufficient governmental interest has been established for § 104(1).
Next, the court considers whether § 104(1) is narrowly tailored to pass the strict scrutiny test. Plaintiffs strenuously argue that § 104(1) is based wholly on impermissible, unconstitutional motives. As discussed in parts A.2. and B.2., above, while the evidence shows that § 104(1) was based in part on impermissible motives (Testimony of Stern; Testimony of Holman; Testimony of Johnson), the inclusion of impermissible motives with the permissible motive of avoiding evasion of other provisions of the statutory scheme does not render § 104(1) unconstitutional. FEC v. CRFCC, 41 F.Supp.2d at 1208.
Plaintiffs further argue that the aggregate limits of § 104(1) have nothing whatsoever to do with preventing corruption by large campaign contributions. The court disagrees. There is evidence in the record of many large campaign contributions by political committees. (Testimony of Gordon; Testimony of Stern; Testimony of Holman; Testimony of Thiebaut; Exhibit B pp. 49-52, 54-60, 64-66). In the context of Colorado election campaigns, the ten, fifteen, twenty, eighty, and four hundred thousand dollar limits of § 104(1) specifically address "large" contributions. Contributions of ten, fifteen, twenty, eighty, or four hundred thousand dollars are large enough to readily support a reasonable perception in Colorado of undue influence. Contributions from political committees that exceed the limits of § 104(1) would create the appearance of corruption caused by large contributions. The court concludes that the limits set forth in § 104(1) are narrowly tailored to address "the reality or perception of undue influence and corruption attributable to large contributions." Russell, 146 F.3d at 568.
The court agrees with Defendants and Amici that the graduated limits of § 104(1) also demonstrate narrow tailoring to the State's compelling interest. While graduated limits cannot save unconstitutionally low limits, Carver, 72 F.3d at 640, § 104(1)'s limits are not unconstitutionally low. The court concludes that the graduated limits of § 104(1) also demonstrate narrow tailoring to the legitimate government interest in preventing corruption and the appearance of corruption in Colorado elections.

b. Equal Protection
The Equal Protection Clause provides that no state may "deny to any person within its jurisdiction the equal protection of the Laws." U.S. Const. amend. XIV. A denial occurs when the state treats similarly situated individuals differently without justification. City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Unless a legislative classification either burdens a fundamental right or targets a suspect class, it need only bear a "rational relation to some legitimate end" to comport with the Equal Protection Clause of the Fourteenth Amendment. Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Because it is not based on a suspect class and because the court has determined that it does not violate Plaintiff's First Amendment rights, § 104(1) is entitled to a strong presumption of validity. Heller v. Doe by Doe, 509 U.S. 312, 319-20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Section 104(1) need only have a rational basis to withstand an equal protection challenge. Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979).
First, a plaintiff must show that the statute burdens the First Amendment rights of certain individuals to a greater extent than others. Second, a plaintiff must show that this differential treatment was not justified. "[I]t is the claimant's burden to demonstrate in the first instance a discrimination against [him] of some substance." Clements v. Fashing, 457 U.S. 957, 967, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (internal quotation marks and citations omitted). An equal protection claim can succeed only if the plaintiff can show *1092 that the impositions placed upon it are more stringent than those placed upon similarly situated persons. Jenness v. Fortson, 403 U.S. 431, 440, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). If the court finds no discrimination, its analysis ends without considering the issue of justifiableness. Russell, 978 F.Supp. at 1227.
Plaintiffs argue that § 104(1) "improperly discriminates in favor of early donors and effectively excludes political speech in the nature of contributions by political committees who may wish or be compelled to contribute at a later date after the specified receipt limits have been reached." (Civil Action No. 97-S-221 May 7, 1997 Amended Complaint ¶ 54). First, the court determines that "late" political committee contributors are not burdened more than "early" political committee contributors. Some candidates refuse contributions from certain special interests or from any political committee. Some candidates refuse contributions greater than a certain amount. Because a candidate is free to refuse or return any contribution to make room for another contribution, whether or not a political committee will ultimately be able to contribute to a candidate is left up to the candidate. Gard, 456 N.W.2d at 829. The FCPA does not impose a greater burden on the First Amendment rights of "late" contributors than "early" contributors.
Although the court finds no discrimination and its analysis can end without considering the issue of justifiableness, Russell, 978 F.Supp. at 1227, nevertheless the court would determine also that any disparate burden placed on political committees by § 104(1) is in furtherance of sufficiently important government interests in preventing "the reality or perception of undue influence and corruption attributable to large contributions." Russell, 146 F.3d at 568. Different entities may be treated differently if different forms of regulation are necessary to protect the integrity of the electoral process. CalMed, 453 U.S. at 201, 101 S.Ct. 2712. The aggregate limits of § 104(1) are "a necessary and constitutional means of [c]losing a loophole that would otherwise destroy the effectiveness" of the other statutory provisions. Buckley, 519 F.2d at 853. Any disparate treatment between political committees and individuals is rationally related to preventing evasion of the FCPA's limitations on direct contributions to candidates. See Terry, 108 F.3d at 649. The court, finding a rational basis for § 104(1)'s aggregate limits on political committee contributions, finds no equal protection violation.

c. Unconstitutional Expenditure Limit
Expenditures are protected by the First Amendment. Buckley, 424 U.S. at 39-59, 96 S.Ct. 612. Plaintiffs argue that § 104(1)'s aggregate limits constitute a de facto expenditure limit. The court disagrees. Section 104(1) addresses the receipt of contributions by candidates, rather than the giving of contributions by political committees. The FCPA does not limit aggregate contributions by individuals to political committees. The FCPA does not limit the total amount political committees can contribute overall, but only the amount they can contribute to a single candidate. The aggregate limits do not prohibit political committees from making expenditures to support or oppose candidates. There is no limit in the FCPA on the number of political committees that may be established. The court concludes that § 104(1) does not constitute an impermissible ban on political committee spending.

4. Colo.Rev.Stat. § 1-45-106(2)
In Claim XV in Complaint No. 96-S-2973 and the Eighth Claim in Complaint No. 97-S-221, Plaintiffs Panckey and Wham challenge § 1-45-106(2). Plaintiffs Panckey and Wham contend that § 106(2) is unconstitutional because it burdens their First Amendment rights, is not narrowly tailored to any compelling state interest, and violates their right to equal protection of the law.
*1093 Section 1-45-106 was amended by the General Assembly of the State of Colorado on May 27, 1998. Section 106 now provides:
Unexpended campaign contributions.
(1)(a) Unexpended campaign contributions to a candidate committee may be contributed to a political party subject to the limitation set forth in section 1-45-104(4), donated to a charitable organization recognized by the internal revenue service, returned to the contributors, or retained by the committee for use by the candidate in a subsequent campaign pursuant to the restrictions set forth in subsection (2) of this section. In no event shall contributions to a candidate committee be used for personal purposes not reasonably related to supporting the election of the candidate.
(b) In addition to any use described in paragraph (a) of this subsection (1), a person elected to a public office may use unexpended campaign contributions held by the person's candidate committee for any of the following purposes:
(I) Voter registration;
(II) Political issue education, which includes obtaining information from or providing information to the electorate;
(III) Postsecondary educational scholarships;
(IV) To defray reasonable and necessary expenses related to mailings and similar communications to constituents;
(V) Any expenses that are directly related to such person's official duties as an elected official, including, but not limited to, expenses for the purchase or lease of office equipment and supplies, room rental for public meetings, necessary travel and lodging expenses for legislative education such as seminars, conferences, and meetings on legislative issues, and telephone and pager expenses.
(2) Any unexpended campaign contributions retained by a candidate committee for use in a subsequent election cycle shall be counted and reported as contributions from political committees in any subsequent election for purposes of section 1-45-104(1) no matter how those contributions were originally classified.
Plaintiff Wham acknowledges that her challenge to § 106(2) is identical to her challenge to § 104(1). As the court has upheld § 104(1) as constitutional, Wham's challenge to § 106(2) is moot. The court concludes that Plaintiff Panckey's challenge is likewise moot in light of the court's determination that § 104(1) does not violate the Plaintiffs' First Amendment or equal protection rights. In addition, the State has a legitimate governmental interest in preventing candidates from using contributions obtained in one campaign to avoid contribution limits in the next campaign. Section 106(2) controls how a candidate committee can use unexpended campaign funds that are not used in accordance with § 106(1). Section 106(2) is justified as preventing incumbents from stockpiling large amounts of money and eluding other provisions of the FCPA. There is evidence in the record of substantial carryovers retained as "war chests" or contributed to other candidates or to political parties. (Testimony of Thiebaut; Exhibit 30; Testimony of Panckey; Exhibit 1; Testimony of Wham; Exhibit 3C). Section 106(2) protects the integrity of the FCPA's overall regulatory scheme. The court concludes that the State's interest in preventing avoidance of valid contribution limits by use of carryovers is both compelling and served by this restriction. This provision is narrowly tailored to accomplish the State's legitimate interest.

5. Colo.Rev.Stat. §§ 1-45-104(4) and 1-45-104(5)
Sections 104(4) and (5) address contribution limits to and from political parties. In Claim III in Civil Action No. 96-S-2973 and the Fourth Claim in Civil Action No. 97-S-221, the Republican Party, CEA EdPAC, and CRC challenge the aggregate contribution limits to political parties set forth in § 104(4). The challenged portion of Colo.Rev.Stat. § 104(4) provides:

*1094 Nor shall a political party accept aggregate contributions from any person that exceed twenty-five hundred dollars per year.
Plaintiffs Republican Party, CEA EdPAC, and CRC contend that § 104(4) is unconstitutional because it burdens their First Amendment rights, is not narrowly tailored to any compelling state interest, and violates their right to equal protection of the law.
In Claim IV in Civil Action No. 96-S-2973, the Republican Party challenges the contribution limits imposed upon political parties by § 104(5). Section 104(5) provides:
In the applicable election cycle, no political party shall contribute more than:
(a) ten thousand dollars to any one state representative, state board of education, or regent of the University of Colorado candidate committee;
(b) fifteen thousand dollars to any one state senate candidate committee;
(c) twenty thousand dollars to any one lieutenant governor candidate committee;
(d) eighty thousand dollars to any one secretary of state, attorney general, or state treasurer candidate committee; and
(e) four hundred thousand dollars to any one gubernatorial candidate committee.
The Republican Party contends that § 104(5) is unconstitutional because it burdens its First Amendment rights, is not narrowly tailored to any compelling state interest, and violates its right to equal protection of the law.

a. Narrow Tailoring to a Compelling State Interest
i. Plaintiffs first argue that, because a political party is a unique entity that does not pose any of the same corruption potential that other entities pose, CRFCC, 518 U.S. at 646-48, 116 S.Ct. 2309 (Thomas, J., concurring in judgment and dissenting in part), there can be no compelling State interest in regulating political parties to prevent the reality or appearance of corruption.[8] The court disagrees.
There is a compelling government rationale for limiting contributions to and from political parties. As Justice Stevens wrote:
First, such limits serve the interest in avoiding both the appearance and the reality of a corrupt political process. A party shares a unique relationship with the candidate it sponsors because their political fates are inextricably linked. That interdependency creates a special danger that the party  or the person who controls the party  will abuse the influence it has over the candidate by virtue of its power to spend.... Second, these restrictions supplement other spending limitations embodied in the Act, which are likewise designed to prevent corruption.... We have recognized the legitimate interest in blocking similar attempts to undermine the policies of the Act....
CRFCC, 518 U.S. at 649-50, 116 S.Ct. 2309 (Stevens, J., dissenting). Political parties act in the political arena, seek to elect candidates of their choice, spend money, and pursue certain policy outcomes. "Moreover, political parties also share relevant features with many PACs, both having an interest in, and devoting resources to, the goal of electing candidates who will `work to further' a particular `political agenda.'" CFRCC, 518 U.S. at 624, 116 S.Ct. 2309. There is genuine potential for corrupting undue influence on a candidate's campaign if political parties are not restricted in their ability to contribute to individual candidates. See Gard, 456 N.W.2d at 824.
*1095 In order to prevent circumvention of individual contribution limits, Congress can directly limit contributions to political parties rather than indirectly preventing circumvention of individual contribution limits by limiting political parties' independent expenditures. CRFCC, 518 U.S. at 617, 116 S.Ct. 2309. The Supreme Court sustained the constitutionality of the Federal Election Campaign Act's $25,000 annual aggregate limit on contributions by an individual because it "serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of ... huge contributions to the candidate's political party." Buckley, 424 U.S. at 38, 96 S.Ct. 612.
The evidence has shown that in Colorado a few individual donors give large amounts of money to political parties and that political parties give large amounts of money to candidates. (Testimony of Victoria Buckley; Exhibits 25, 160, 179, 191, 192). Historically, political parties in Colorado have made significant contributions to their preferred candidates. Many of those contributions have been in the form of coordinated in-kind contributions, such as mailings made on behalf of a candidate. While it is true that the drafters and proponents of the FCPA did not consider the potential impact on dollars and donors as to political parties (Testimony of Stern; Testimony of Johnson), without §§ 104(4) and 104(5), the FCPA has a major loophole through which contributors could make large donations to candidates through political parties. The existence of prohibitions against the "earmarking" of contributions to a political party for a particular candidate does not invalidate or make unnecessary §§ 104(4) and (5). See Gard, 456 N.W.2d at 823-24. The court concludes that Colorado has a compelling interest in preventing the appearance or reality of corruption created by large contributions by political parties and in limiting contributions to and from political parties to prevent groups and individuals from circumventing their contribution limits by making contributions to political parties. Sections 104(4) and (5) are appropriate means by which to protect the State's compelling interest in preventing real or apparent corruption and in protecting the integrity of the FCPA's other contribution restrictions.
ii. Plaintiffs also allege that the limits established by §§ 104(4) and (5) are unconstitutionally low. The evidence does not support Plaintiffs' allegation.
"A [political] party's associational rights are not unduly infringed by contribution limits that are not different in kind." State v. Alaska Civil Liberties Union, 978 P.2d 597, 626 (Alaska 1999). Under the analysis used in Russell, 146 F.3d at 571, § 104(4)'s $2500 aggregate limit is substantially higher than the $1,000 limit upheld in Buckley, 424 U.S. at 20-35, 96 S.Ct. 612, and is not substantially lower than the $5,000 limit upheld in CalMed, 453 U.S. at 193-200, 101 S.Ct. 2712. Nor does the evidence support a finding that §§ 104(4)'s limit is too low under the analyses used in Carver, 72 F.3d at 643, Day, 34 F.3d at 1366, or Russell, 978 F.Supp. at 1221. Donors who contributed over $2,500 constituted less than 1% of all contributors for 1992 through 1997. (Exhibit 179; Testimony of John S. Dorrenbacher).
The $2,500 aggregate limit in § 104(4) and the graduated limits in § 104(5) are closely correlated to the contribution amounts that raise the appearance of corruption in Colorado elections. The $2,500 limit in § 104(4) is one-tenth of the limit in the Federal Election Campaign Act, a reasonable percentage in light of the differences between national and state-level campaigns. While a contribution greater than $2,500 may not be a significantly large percentage of the total amounts raised each year by political parties (Exhibit 162), contributions greater than $2,500 that could make their way to candidates around the other provisions of the FCPA would raise the appearance of corruption in Colorado. Likewise, in the context of Colorado election campaigns, the *1096 ten, fifteen, twenty, eighty, and four hundred thousand dollar limits of § 104(5) specifically address contributions large enough to support a reasonable perception of undue influence in Colorado. Contributions from political committees that exceed the limits of § 104(5) would create the appearance of corruption caused by large contributions. The graduated limits of § 104(5) also demonstrate narrow tailoring to the State's compelling interest in preventing corruption and the appearance of corruption in Colorado elections.
The Plaintiffs' evidence that the limits in §§ 104(4) and (5) are too low is unconvincing. The documentary evidence does not support the Plaintiffs' allegations and testimony that political parties in Colorado are suffering a severe adverse effect on fundraising due to §§ 104(4) and (5). (Exhibit 21; Testimony of Talmey). The evidence indicated that very few contributions would be affected by § 104(4). (Prel.Inj. Exhibits 9, 10, 11, 12, I, J, K, L, N, O; Prel.Inj. Testimony of Dorrenbacher). Some of the evidence showed increased donations after the FCPA.[9] The Republican Party acted as a conduit for some funds that cannot properly be counted as funds affected by §§ 104(4) and (5). Some alleged impacts on the Republican Party were in fact impacts on money that was not the Republican Party's. Certain alleged non-candidate expenses were shown to have been repaid by the candidates (Exhibit 25; Testimony of Dorrenbacher; Testimony of Wham). Records kept of contributions to and from the Republican Party were somewhat unreliable. See Exhibits 33, 34, 7T, Testimony of Dorrenbacher. Contributions to the Republican Party were sometimes recorded as transfers from candidate committees or political committees. (Testimony of Dorrenbacher). While some evidence reflects significant reductions in dollars received by the Republican Party (Prel.Inj. Exhibit 27; Exhibit 160; Testimony of Curtis; Testimony of Dorrenbacher), the evidence also indicated that some money was received by the Republican Party outside the reporting requirements, thus reducing the severe impact alleged. (Exhibit 7P; Testimony of Curtis).
Plaintiffs' evidence of the impact on transfers from the Republican National Committee to the Republican Party in Colorado is likewise unconvincing. National party transfers do not appear in the Secretary of State's records and the evidence does not sufficiently show what funds were for national elections and what funds were for state elections. It is unclear whether the non-candidate activities allegedly affected by the FCPA were allocated to state or federal activities. (See Exhibits 23, 160).
The Republican Party also experienced substantial changes in fundraising during the tenure of Steve Curtis as Chairman. While he was Chairman, Curtis presided over and generated numerous controversies within the Republican Party. (Prel.Inj. Testimony of Bruce Holland; Prel.Inj. Testimony of Curtis; Trial Testimony of Curtis). The evidence shows that the Republican Party's fundraising was significantly affected by forces other than the limits of §§ 104(4) and (5).
In sum, the limits set by §§ 104(4) and (5) are not unconstitutionally low.
iii. Plaintiffs further argue that §§ 104(4) and (5) cannot be narrowly tailored to a compelling government interest because they unconstitutionally infringe on Plaintiffs' non-candidate-related activities, such as administrative overhead, voter registration, issue advocacy, ballot measure campaigns, and lobbying. While §§ 104(4) and (5) do not specifically prohibit any expenditures, Plaintiffs argue that any limit on money coming into political parties unconstitutionally limits money spent by political parties.
*1097 First, the court disagrees that, by limiting the aggregate contributions by individuals to political parties and the amount of money that a political party can contribute to a candidate, §§ 104(4) and (5) are expenditure limits. Both political parties and candidates can receive contributions from many other sources. Therefore, §§ 104(4) and (5) are only marginal restrictions on speech.
Second, the Plaintiffs' argument is not consistent with the case law. In Berkeley, the Court noted that "contribution limits automatically [affect] expenditures, and limits on expenditures operate as a direct restraint on freedom of expression of a group or committee desiring to engage in political dialogue concerning a ballot measure." 454 U.S. at 299, 102 S.Ct. 434. However, in Berkeley, the Court found there was no compelling government interest in preventing corruption because the challenged ordinance limited committees formed to support or oppose ballot measures. 454 U.S. at 297-99, 102 S.Ct. 434. Ballot measures do not pose the same potential for corruption because "[r]eferenda are held on issues, not candidates for public office." Bellotti, 435 U.S. at 790, 98 S.Ct. 1407. "The risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue." Bellotti, 435 U.S. at 790, 98 S.Ct. 1407.
Similar limits on political committees have been upheld. CalMed, 453 U.S. at 197-99, 101 S.Ct. 2712; Terry, 108 F.3d at 649; see also CalMed, 453 U.S. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring). Political committees conduct the same kind of non-candidate-related activities as political parties conduct. Political committees have administrative overhead and engage in voter registration, issue advocacy, ballot measure campaigns, and lobbying. Likewise, corporations' political activities have been limited not only based on the use of the corporate form per se, but also based on the potential for the unfair deployment of wealth for political purposes. NRWC, 459 U.S. at 207-10, 103 S.Ct. 552. With their relatively substantial resources, political parties present the same potential for the unfair deployment of wealth in Colorado elections.
Third, the Supreme Court has specifically indicated that such limits may be appropriate:
We could understand how Congress, were it to conclude that the potential for evasion of the individual contribution limits was a serious matter, might decide to change the statute's limitations on contributions to political parties.
CRFCC, 518 U.S. at 617, 116 S.Ct. 2309.
Finally, the evidence does not support Plaintiffs' allegation that §§ 104(4) and (5) infringe on their issue advocacy. As described in part 5.a.ii. of this opinion, above, Plaintiffs' evidence of the impact on their non-candidate activities is less than convincing.
In sum, the court concludes that §§ 104(4) and (5) are adequately tailored to address the State's legitimate government interest in preventing potential corruption associated with contributions to and by political parties and in preventing the avoidance of other contribution limits.

b. Equal Protection
Plaintiffs allege that §§ 104(4) and (5) violate their right to equal protection. First, the court finds no discrimination against political parties. The limits set forth in §§ 104(4) and (5) are relatively generous in the scheme of the FCPA. Sections 104(4) and (5) allow political parties to contribute to candidates in much higher amounts than others and to accept much larger contributions. Like individuals and other entities, political parties may make independent expenditures on behalf of a candidate or an issue. All political parties are subject to the same limitations. There is no bias against the Republican Party and no evidence in the record that the limits have somehow been unevenly applied to different parties.
Even if the court were to find that §§ 104(4) and (5) discriminate against political *1098 parties, the court would determine also that any disparate burden placed on political parties is in furtherance of sufficiently compelling government interests in preventing the reality or perception of undue influence and corruption attributable to large contributions by political parties and in preventing the circumvention of other contribution limits.
For all of the above reasons, the court concludes that §§ 104(4) and (5) are sufficiently tailored to minimize intrusion upon Plaintiffs' First Amendment interests. Plaintiffs have failed to meet their burden to demonstrate the unconstitutionality of §§ 104(4) and (5).

III. Severability
As a general rule, if a statute is constitutional in one part and unconstitutional in another, the constitutional provision may be sustained and the unconstitutional stricken. Buckley, 424 U.S. at 108, 96 S.Ct. 612. "`Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" Buckley, 424 U.S. at 108, 96 S.Ct. 612 (quoting Champlin Refining Co. v. Corporation Com'n of State of Okl., 286 U.S. 210 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932)).
Severability is an issue of state law. Jane L. v. Bangerter, 61 F.3d 1493, 1497 (10th Cir.1995), judgment reversed on other grounds, 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). A federal court is empowered to determine whether, pursuant to state law, an unconstitutional provision of a state statute can be severed. Leavitt v. Jane L., 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996); Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 506, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: the autonomy of the portions remaining after the defective provisions have been deleted, and the intent of the enacting legislative body. City of Lakewood v. Colfax Unlimited Ass'n. Inc., 634 P.2d 52, 70 (Colo.1981) (citations omitted). The court may sever and strike any portion of a statute that it holds to be unconstitutional, and may limit the portion stricken to single words or phrases where appropriate. Rodriguez v. Schutt, 914 P.2d 921, 929 (Colo.1996).
The Colorado Supreme Court has instructed that "[i]n determining the severability of the sections of a statute, the court must look to legislative intent." People v. Nguyen, 900 P.2d 37, 40 (Colo. 1995) (en banc) (internal quotation marks and citation omitted). The FCPA provides for severability:
If any provision of this article or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the article which can be given effect without the invalid provision or application, and to this end the provisions of this article are declared to be severable.
Colo.Rev.Stat. § 1-45-118. A severability clause creates a presumption that the General Assembly would have been satisfied with the portions of the statute that remain after the offending provisions are stricken as unconstitutional. People v. District Court, 834 P.2d 181 (Colo.1992). However, the presumption in favor of severability is dispelled if what remains is so incomplete or riddled with omissions that it cannot be "salvaged ... as a meaningful legislative enactment." City of Lakewood, 634 P.2d at 70 (quoting Pierce v. City and County of Denver, 193 Colo. 347, 565 P.2d 1337, 1340 (1977)); Montezuma Well Service, Inc. v. Industrial Claim Appeals Office of State of Colo., 928 P.2d 796, 798 (Colo.App.1996).
Section 1-45-118 indicates that the voters who passed the FCPA as a ballot initiative would have intended the valid portions of the FCPA to stand if other portions of the FCPA were invalidated. The court must honor the intent of the FCPA's drafters and the voters that, *1099 to the extent possible, each provision of the statute should be given effect on its own. The FCPA is a comprehensive scheme of campaign finance regulation. Although the contribution limits set forth in §§ 104(2) and (7) are part of that comprehensive scheme, they are not so mutually interdependent with the remainder of the FCPA that severance is precluded. The invalidation of §§ 104(2) and 104(7) does not so undermine the structure of the FCPA as a whole that the entire FCPA must fall. The purpose of the valid provisions is not thwarted by the invalidation of §§ 104(2) and 104(7). The remaining portions of the FCPA are autonomous and coherent in the absence of the invalid provisions. Legal effect can be given to the remaining provisions of the FCPA. The court concludes that §§ 104(2) and (7) are severable. Accordingly, §§ 104(2) and (7) are severed from the remainder of the statute and stricken.

IV. Conclusion
In January of 1999, legislation was introduced in the Colorado House of Representatives that would have modified certain provisions of the FCPA, including the provisions hereby invalidated by the court. (HB 99-1110). The court postponed ruling on this matter in deference to the legislative process. HB 99-1110 passed the House. However, after amendments were made by the Senate, the House and the Senate could not agree on their differing versions and HB 99-1110 failed to pass concurrence between the House and Senate versions. HB 99-1110 failed in the full House on May 4, 1999. In the absence of action by the legislative branch, the court was then compelled to proceed with this opinion.
Accordingly, IT IS ORDERED:
1. Section 1-45-104(2) is hereby invalidated as unconstitutional. Judgment on Claim I in Civil Action No. 96-S-2973 and the Second Claim in Civil Action No. 97-S-221 shall enter in favor of Plaintiffs Durham, Thiebaut, CRC, CEA EdPAC, and Good and against Defendant.
2. Section 1-45-104(7) is hereby invalidated as unconstitutional. Judgment on Count VI in Civil Action No. 96-S-2844, Claim II in Civil Action No. 96-S-2973, and the Third Claim in Civil Action No. 97-S-221 shall enter in favor of Plaintiffs CRGSPAC, Durham, the Republican Party, CRC, and Crown Point and against Defendant.
3. Sections 1-45-104(1), 104(4), 104(5), and 106(2) are hereby upheld as valid. Judgment on the Fourth, Fifth, and Eighth Claims in Civil Action No. 97-S-221 and Claims III, IV, and XV in Civil Action No. 96-S-2973 shall enter in favor of Defendant and against Plaintiffs Durham, Thiebaut, CEA EdPAC, the Republican Party, Panckey, and Wham.
4. All other claims in these consolidated complaints (except the Seventeenth Claim in Civil Action No. 97-S-221) have previously been dismissed or adjudicated.
5. Further proceedings shall be held on the Seventeenth Claim in Civil Action No. 97-S-221 (Plaintiffs' claim for attorneys' fees pursuant to 42 U.S.C. § 1988).
NOTES
[1] Due to recent death of Victoria Buckley, Donetta Davidson is now Colorado's Secretary of State.
[2] Plaintiff Citizens for Responsible Government State Political Action Committee ("CRGSPAC") is a political committee registered in the State of Colorado. Plaintiff CRGSPAC's single remaining claim is its challenge to § 1-45-104(7) in Count VI of Civil Action No. 96-S-2844. Plaintiffs Colorado Right to Life Committee, Inc. and Citizens for Responsible Government, Inc. are no longer Plaintiffs in this action because the court determined on June 18, 1997 that §§ 1-45-103(7) and 1-45-103(10)(a) of the FCPA did not apply to them. Therefore, § 104(7) does not apply to them either. See Court's Order of Judgment June 18, 1997; Court's Order February 5, 1998. On April 17, 1998, the court granted summary judgment in favor of Defendant Buckley and against Plaintiffs Colorado Right to Life Committee, Inc. and Citizens for Responsible Government, Inc. on § 1-45-107 of the FCPA. See Court's April 17, 1998 Memorandum Opinion and Order. The court determined on April 1, 1998 that Plaintiff CRGSPAC lacked standing to challenge §§ 1-45-104(1) and 1-45-(2) of the FCPA and the court dismissed Counts IV and V in Civil Action No. 96-S-2844. See Court's Minutes April 1, 1998; Order on Reconsideration July 31, 1998.

Plaintiff Durham is an individual who makes personal contributions to candidates. Durham's remaining claims include Claims I and II in Civil Action No. 96-S-2973, challenging §§ 1-45-104(2) and (7).
Plaintiff Panckey was an elected member of the House of Representatives at the time of trial. Although Plaintiff Panckey continued to argue his Claim XIV in Civil Action No. 96-S-2973, challenging the regulation of unexpended campaign contributions set forth in Colo. Rev.Stat. § 1-45-106(1), the court's records reflect that Plaintiff Panckey's only remaining claim is Claim XV in Civil Action No. 96-S-2973, wherein he challenges the carryover provision contained in Colo.Rev.Stat. § 1-45-106(2). (Court's Order dated February 5, 1998). In any event, subsequent legislative amendment to § 106(1) renders moot Panckey's challenge. Kentucky Right to Life v. Terry, 108 F.3d 637, 644 (6th Cir.), cert. denied, ___ U.S. ___, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997). Panckey's single remaining claim is Claim XV in Civil Action No. 96-S-2973, challenging the limitations on use of excess campaign funds set forth in § 1-45-106(2).
Plaintiff Colorado State Republican Central Committee ("Republican Party") is a political party as set forth under Colorado election law and the FCPA. The Republican Party's remaining claims include Claims III and IV in Civil Action No. 96-S-2973, challenging §§ 1-45-104(4) and (5).
Plaintiff Colorado Republicans for Choice ("CRC") is an unincorporated Colorado political committee. CRC's remaining claims include the Second, Third, and Fourth Claims in Civil Action No. 97-S-221, challenging §§ 1-45-104(2)(b), (4), and (7).
Plaintiff Crown Point Communications, Inc. ("Crown Point") is a Colorado corporation that contributes to political committees in Colorado. Crown Point's single remaining claim is the Third Claim in Civil Action No. 97-S-221, challenging § 1-45-104(7).
Plaintiff Wham was an elected member of the Colorado Senate at the time of trial. Wham's single remaining claim is the Eighth Claim in Civil Action No. 97-S-221, challenging § 1-45-106(2).
Plaintiff Thiebaut is an elected member of the Colorado Senate. Thiebaut's remaining claims include the Second and Fifth Claims in Civil Action No. 97-S-221, challenging §§ 1-45-104(1) and (2)(b).
Plaintiff Good is an individual who contributes to political campaigns. Good's remaining claims include the Second and Third Claims in Civil Action No. 97-S-221, challenging §§ 1-45-104(2)(a) and (7).
Plaintiff CEA EdPAC is a Colorado nonprofit corporation and political committee. CEA EdPAC's remaining claims include the Second, Fourth, and Fifth Claims in Civil Action No. 97-S-221, challenging §§ 1-45-104(1), (2), and (4).
[3] Amici Colorado Common Cause and the League of Women Voters of Colorado were the principal drafters and proponents of the FCPA.
[4] Stern did not specifically work on the FCPA, but has been extensively involved with drafting and promoting other similar laws.
[5] Amici challenge the use of percentages as a method of analysis, suggesting that under this method, the more egregious the situation, the more impossible it is to reform. Amici recite the extreme hypothetical that where one donor funds an entire gubernatorial campaign, the impact of the FCPA on that campaign's contributions would be 100 percent. However, in such an example, the limits would be precisely tailored to the government's compelling interest.
[6] Because the court has determined that § 104(2) violates the First Amendment because it is not narrowly tailored to a compelling state interest, the court does not reach Plaintiffs' argument that § 104(2) violates the Plaintiffs' right to equal protection.
[7] Because the court has determined that § 104(7) violates the First Amendment because it is not narrowly tailored to a compelling state interest, the court does not reach Plaintiffs' argument that § 104(7) violates the Plaintiffs' right to equal protection.
[8] The FCPA specifically defines a political party as:

"any group of registered electors who, by petition or assembly, nominate candidates for the official general election ballot. `Political party' includes affiliated party organizations at the state, county, and election district levels and all such affiliates are considered to be a single entity for purposes of this article." Colo.Rev.Stat. § 1-45-103(12).
[9] Defendant also cited Exhibits 3W, 3X, 3Y, 4A, and 4B as support for the narrow tailoring of § 104(4) and (5). However, because these exhibits were not received in evidence, the court may not rely upon them.